PER CURIAM.
 

 This is an appeal from a non-final order denying WH Smith, PLC’s (“Smith PLC”) motion to dismiss for lack of personal jurisdiction, based on the trial court’s finding that Benages & Associates, Inc. (“Benag-es”) established personal jurisdiction under an alter ego theory. Following our de novo review,
 
 see Wendt v. Horowitz,
 
 822 So.2d 1252 (Fla.2002), we reverse and remand with instructions to grant Smith PLC’s motion to dismiss as Benages failed to, and cannot, establish personal jurisdiction against Smith PLC under the alter ego theory.
 

 On March 30, 2001, Benages and W.H. Smith, Inc. entered into an Agreement for Consultancy Services (“Agreement”), in which Benages agreed to assist W.H. Smith, Inc. to obtain a five-year lease for retail concessions at Miami International Airport (“MIA”). The Agreement provides that it can be terminated by giving ninety days written notice, but once W.H. Smith, Inc. is
 
 operating
 
 retail concessions at MIA, the Agreement cannot be terminated. Further, W.H. Smith, Inc. agreed to pay Benages a monthly retainer fee until the lease is executed, and thereafter, a success fee for five years. The Agreement was signed by Sean Anderson as Chief Executive Officer (“CEO”) of W.H. Smith, Inc., which is located in Georgia.
 

 On October 1, 2003, W.H. Smith, Inc. notified Benages that it was terminating the Agreement because W.H. Smith Group Holdings (USA), Inc. decided to exit the United States airport and hotel markets, and therefore, neither WH Smith Airports, Inc. nor any other WH Smith entity would be pursuing or entering into a lease to operate retail concessions at MIA. Benag-es was paid the monthly retainer for ninety days as required by the Agreement, but did not receive the success fee.
 

 In 2003, Benages filed an action against W.H. Smith, Inc., W.H. Smith Airport Partners, Inc., W.H. Smith of Florida, Inc., and W.H. Smith Group Holdings, Inc. (“Smith U.S. Defendants”) and others, alleging, in part, a breach of the Agreement. In August 2009, a final default judgment was entered against the Smith U.S. Defendants, which are now defunct.
 

 Thereafter, in February 2010, Benages filed its Amended Motion to Pierce the Corporate Veil of W.H. Smith Group Holdings and to Implead W.H. Smith, P.L.C. (“Motion to Pierce”), setting forth jurisdictional allegations based on an alter ego theory. The Motion to Pierce requested that the trial court enter an order (1) piercing the corporate veil of the Smith U.S. Defendants; (2) impleading the alter ego corporate parent of the Smith U.S. Defendants — Smith PLC; and (3) holding Smith PLC liable as the alter ego of the Smith U.S. Defendants. The Motion to Pierce asserted, in part, that the Smith U.S. Defendants were dominated and controlled by their corporate parent, Smith PLC, and Smith PLC used the Smith U.S. Defendants for an improper purpose— Smith PLC directed the Smith U.S. Defendants to breach the Agreement knowing that any judgment against the Smith U.S. Defendants would be uncollectible. The Motion to Pierce relied, in part, on the 2009 deposition of Sean Anderson, the former CEO of W.H. Smith, Inc., who testified that “all decisions with regard to U.S.A. were made in London.”
 

 
 *580
 
 In response, Smith PLC filed a Motion to Dismiss for Lack of Personal Jurisdiction (“Motion to Dismiss”) and several affidavits in support of its Motion to Dismiss, asserting as follows. W.H. Smith Group Holdings, Inc. is a Nevada corporation which directly or indirectly owned the remaining three Smith U.S. entities — W.H. Smith, Inc., W.H. Smith Airport Partners, Inc., and W.H. Smith of Florida, Inc. Smith PLC asserted that it has no minimum contacts with Florida because it does not own or lease property in Florida; has no agents, offices, registered agent, or employees in Florida; has never held a meeting in Florida; and has never done business in Florida. Further, Smith PLC is a public limited company organized under the laws of England and Wales, with its principal place of business in the United Kingdom, and the Smith U.S. Defendants are United States-based, indirect subsidiaries of Smith PLC.
 

 Smith PLC argued that Benages failed to allege any facts to support its allegations that the Smith U.S. Defendants had no independence or that the Smith U.S. Defendants were mere “shams” or “shells.” Rather, the affidavits reflect that the WH Smith entities in the United States had thousands of employees and hundreds of retail stores, and had significant assets and revenues, with W.H. Smith Group Holdings, Inc. reaching over $800 million in sales in 2003. The Smith U.S. Defendants had their own bank accounts, with United States-based employees and managers who were signatories on these bank accounts. The Smith U.S. Defendants never leased any property from Smith PLC, and instead, the Smith U.S. Defendants leased properties in their own names, with none being co-signed or guaranteed by Smith PLC. Further, decisions relating to the Smith U.S. Defendants were not made by Smith PLC, and the Smith U.S. Defendants operated independently. As to the Agreement, Smith PLC was not a party to the Agreement; Smith PLC has never had business dealings with Benages; and Smith PLC did not have any involvement in any attempt to obtain a concession at MIA. Although Smith PLC and the Smith U.S. Defendants had separate board of directors and officers, at various times, they did have one overlapping officer.
 

 Following the Motion to Dismiss, Benag-es filed the affidavit of Michael Benages, who, in essence, averred that by April 2002 — which is after Benages and W.H. Smith, Inc. entered into the Agreement but before the “formal Concession bidding process began” — Smith PLC already had decided to exit the United States markets and to sell the Smith U.S. Defendants. To make the sale of the Smith U.S. Defendants more attractive to potential buyers, Smith PLC used the Smith U.S. Defendants to “fool” Benages into believing that the Smith U.S. Defendants intended to actually operate concessions at MIA once it obtained the concessions through the bidding process. Benages, however, was not aware that Smith PLC was making “all significant decisions” for the Smith U.S. Defendants and that Smith PLC had already decided to sell off the Smith U.S. Defendants.
 

 In addition to Mr. Benages’ affidavit, Benages also filed a second affidavit which was executed by Mr. Anderson, stating: “[D]uring my tenure with W.H. Smith, Inc., WH Smith PLC dominated the Smith U.S. Defendants and made all significant decisions for the Smith U.S. Defendants, each of which took direction from Smith PLC.”
 

 Following a hearing, at which no live testimony was taken, the trial court, relying on the voluminous discovery, denied the Motion to Dismiss, concluding:
 

 
 *581
 
 Well, motion to dismiss is denied. Not because of the allegations I heard about bid rigging or campaign contributions or securities fraud. But my belief is the acts of PLC in terms of — I’m sorry — the acts of Smith U.S.A. going forward with attempting to get the bid when it appears as if through PLC they’d already made the decision not [to] follow through with the contract for the purpose of making Smith U.S.A. look more marketable was sufficient.
 

 The trial court entered an order denying Smith PLC’s motion to dismiss. This non-final appeal followed.
 

 Smith PLC contends that the trial court erred by denying its Motion to Dismiss. We agree because, as a matter of law, based on the disputed facts, which we view in the light most favorable to Benages, and the uncontroverted facts, Benages cannot establish that Smith PLC was the alter ego of the Smith U.S. Defendants.
 

 In the instant case, Benages relied on the “alter ego theory,” not Florida’s long-arm statute, section 48.193, Florida Statutes (2009), to establish personal jurisdiction over Smith PLC.
 
 [1]
 
 Under the alter ego theory, “[a] nonresident shareholder of a corporation doing business in Florida may be subject to long-arm jurisdiction” if the alter ego test can be met.
 
 Aldea Comm’ns, Inc. v. Gardner, 725
 
 So.2d 456, 457 (Fla. 2d DCA 1999);
 
 see also Bellairs v. Mohrmann,
 
 716 So.2d 320, 322 (Fla. 2d DCA 1998) (“Under the alter ego theory of long-arm jurisdiction, a nonresident shareholder of a resident corporation may be subject to long-arm jurisdiction where the alter ego test can be met.”).
 

 To establish jurisdiction under the alter ego theory, the plaintiffs pleading must set forth sufficient jurisdictional allegations to pierce the corporate veil of the resident corporation.
 
 Bellairs,
 
 716 So.2d at 322. The corporate veil cannot be pierced unless the plaintiff can establish
 
 “both
 
 that the corporation is a ‘mere instrumentality’ or alter ego of the defendant,
 
 and
 
 that the defendant engaged in ‘improper conduct’ in the formation or use of the corporation.”
 
 Id.
 
 at 323 (citing
 
 Dania Jai-Alai Palace, Inc. v. Sykes,
 
 450 So.2d 1114, 1120-21 (Fla.1984));
 
 see also Gasparini v. Pordomingo,
 
 972 So.2d 1053, 1055 (Fla. 3d DCA 2008);
 
 Merkin v. PCA Health Plans of Fla., Inc.,
 
 855 So.2d 137 (Fla. 3d DCA 2003);
 
 Symons Corp. v. Tartan-Lavers Delray Beach, Inc.,
 
 456 So.2d 1254 (Fla. 4th DCA 1984).
 

 “[T]he procedure for determining long-arm jurisdiction set forth in
 
 Venetian Salami
 
 ... is universal and therefore applicable to the alter ego theory.”
 
 Merkin,
 
 855 So.2d at 141 (citing
 
 Bellairs,
 
 716 So.2d at 323). As summarized in
 
 Bellairs,
 
 the procedure set forth in
 
 Venetian Salami
 
 is as follows:
 

 [A] plaintiff must first allege a jurisdictional basis in his pleading. Then, if the defendant wishes to contest these allegations, he must file an affidavit specifically addressing the allegations. Once a defendant submits an appropriate affidavit, the plaintiff must support
 
 *582
 
 his allegations with an affidavit of his own. If no disputed factual issues appear on the face of the opposing affidavits, the trial court can decide the long-arm issue without holding an evidentiary hearing. However, if the opposing affidavits conflict with one another, the trial court must “hold a limited evidentiary hearing in order to determine the jurisdiction issue.”
 

 Bellairs,
 
 716 So.2d at 823 (quoting
 
 Venetian Salami,
 
 554 So.2d at 502-03).
 

 In the instant case, as outlined above, after Benages filed its Motion to Pierce, setting forth the jurisdictional allegations under the alter ego theory, the burden shifted to Smith PLC to contest the allegations. Smith PLC then filed several affidavits specifically addressing the allegations set forth in Benages’ Motion to Pierce, thereby shifting the burden back to Benages. In response to Smith PLC’s motion to dismiss and affidavits, Benages then filed Mr. Anderson’s second affidavit, which averred: “[DJuring my tenure with W.H. Smith, Inc., WH Smith PLC dominated the Smith U.S. Defendants and made all significant decisions for the Smith U.S. Defendants, each of which took direction from Smith PLC.” At the hearing on Smith PLC’s Motion to Dismiss, the trial court did not hear any live testimony, but instead relied solely on the arguments of the parties and the voluminous discovery relating to jurisdiction over Smith PLC based on the alter ego theory.
 

 In reviewing the pleadings and the affidavits filed by the parties, we conclude that portions of the affidavits submitted by Benages and Smith PLC are in conflict. Generally, if the opposing affidavits conflict with one another, the trial court is required to “hold a limited evidentiary hearing in order to determine the jurisdiction issue.”
 
 Venetian Salami,
 
 554 So.2d at 502-03. Therefore, we are required to reverse and remand for an evidentiary hearing, unless we can conclude that, as a matter of law, based on the uncontroverted facts and the controverted facts,
 
 viewed in the light most favorable to Benages,
 
 it cannot establish the two-prong test to pierce the corporate veil — that the Smith U.S. Defendants were “mere instrumental-ities” or alter egos of Smith PLC,
 
 and
 
 that Smith PLC engaged in “improper conduct” in the formation or use of the Smith U.S. Defendants.
 

 First, we address whether the Smith U.S. Defendants were “mere instru-mentalities” or alter egos of Smith PLC. In
 
 Gasparini,
 
 this Court stated that in order to establish the first prong, the plaintiff must plead and prove that “the shareholder dominated and controlled the corporation to such an extent that the corporation’s independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation.” 972 So.2d at 1055.
 

 Without rehashing the facts set forth above, the undisputed evidence showed that the Smith U.S. Defendants were incorporated and existed in the United States years before W.H. Smith, Inc. and Benages entered into the Agreement. While in existence, the Smith U.S. Defendants (1) leased their own offices, without Smith PLC co-signing or guaranteeing any of the leases; (2) maintained their own bank accounts, with United States-based employees being signatories on the accounts; (3) had hundreds of retail units and thousands of employees, with W.H. Smith Holdings, Inc. generating over $300 million in revenues in 2003; and (4) had separate management, board of directors, and officers, although at various times, Smith PLC and the Smith U.S. Defendants shared one officer. Further, viewing the disputed facts in the light most favorable to Benages, Smith PLC: (1)
 
 *583
 
 made “all significant decisions” for the Smith U.S. Defendants; (2) directed the Smith U.S. Defendants to continue their effort, with the assistance of Benages, to obtain the MIA concessions, although Smith PLC had already decided to sell the Smith U.S. Defendants and exit the U.S. market, and therefore, even if awarded the MIA concessions, the Smith U.S. Defendants would never operate concessions at MIA; and (3) never informed Benages of this decision, which was made to make the Smith U.S. Defendants more attractive to potential buyers. Based on these facts, many of which were taken in the light most favorable to Benages, although Smith PLC made “all significant decisions” for the Smith U.S. Defendants, the Smith U.S. Defendants were far from being “shams” or “shells.” Therefore, as Benages cannot establish the first prong, the trial court erred by denying Smith PLC’s Motion Dismiss.
 

 Although we have concluded that Benages cannot establish the first prong, and therefore the order under review must be reversed, we briefly address the second prong — whether Smith PLC engaged in “improper conduct” in the formation or use of the Smith U.S. Defendants. In essence, even if it is true that Smith PLC instructed the Smith U.S. Defendants to breach the Agreement, this conduct, without more, does not constitute the type of “improper conduct” necessary to pierce the corporate veil.
 
 See Geigo Props., LLP v. R.J. Gators Real Estate Grp., Inc.,
 
 849 So.2d 1109, 1110 (Fla. 4th DCA 2003) (“The trial court did not err when it found that the mere use of a shell corporation to enter into the lease, and the subsequent breach of the lease by failing to pay rent, did not constitute the type of improper conduct necessary to pierce the corporate veil.”);
 
 see also N. Am. Clearing, Inc. v. Brokerage Computer Sys., Inc.,
 
 666 F.Supp.2d 1299, 1308 (M.D.Fla.2009) (holding that under Florida law, “[clausing a corporation to intentionally breach a contract or commit conversion, without more, does not mislead or defraud creditors such that the corporate veil should be pierced.... However, creditors are defrauded incident to a breach of contract or act of conversion where the breaching alter ego transfers funds out of the corporation such that the corporation’s creditors cannot collect on their claims”).
 

 Accordingly, we reverse the order under review and remand with instructions to enter an order granting Smith PLC’s Motion to Dismiss.
 

 Reversed and remanded.
 

 [1]
 

 . As Benages was traveling under the alter ego theory of long-arm jurisdiction, not section 48.193, it was not required to establish the "two-step process for establishing long-arm jurisdiction as set forth in
 
 Venetian Salami Co. v. Parthenais,
 
 554 So.2d 499 (Fla.1989).”
 
 Bellairs v. Mohrmann,
 
 716 So.2d 320, 323 (Fla. 2d DCA 1998). The two-step process is as follows: "First, it must be determined that the complaint alleges sufficient jurisdictional facts to bring the action within the ambit of [section 48.193]; and if it does, the next inquiry is whether sufficient ‘minimum contacts’ are demonstrated to satisfy due process requirements.”
 
 Venetian Salami,
 
 554 So.2d at 502 (quoting
 
 Unger v. Publisher Entry Serv., Inc.,
 
 513 So.2d 674, 675 (Fla. 5th DCA 1987) (citations omitted)).